IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BARBARA AND RICHARD ARNOLD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:09cv0163 |
| | ) | |
| THE METROPOLITAN GOVERNMENT OF | ) | Judge Thomas A. Wiseman, Jr. |
| NASHVILLE AND DAVIDSON COUNTY, <u>et al.</u> | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION</u>

Plaintiffs Barbara and Richard Arnold filed suit in state court against Defendants Metropolitan Government of Nashville and Davidson County ("Metro") and Mark Smith, both individually and in his official capacity as an employee of Metro. Metro and Mr. Smith (collectively "Defendants") allegedly forced Plaintiffs to spend $1,000 in order to cure a violation of the Metro Code § 16.24.340, when in fact Plaintiffs were not in violation of the Code. Plaintiffs seek recovery under 42 U.S.C. § 1983 for the violation of their Fifth Amendment Due Process rights, Fourteenth Amendment Equal Protection rights, and Fourth Amendment right to be free from unreasonable seizures of property. Plaintiffs also seek to recover against Metro under the Tennessee Governmental Tort Liability Act ("TGTLA") and against Mr. Smith through the common-law tort of intentional misrepresentation. Defendants successfully removed the suit to the United States District Court for the Middle District of Tennessee. Now before the Court is Defendants' Fed. R. Civ. P. 12(b)(6) Motion to Dismiss (Doc. No. 7).

After considering the allegations in the Complaint and the applicable law, this Court will dismiss all of Plaintiffs' claims. Specifically, Plaintiffs' Fourteenth Amendment Equal Protection claim against Mr. Smith and their Fifth Amendment Procedural Due Process claim against Metro shall be dismissed without prejudice. Plaintiffs' Fourteenth Amendment Equal Protection claim against Metro and their Fifth Amendment Procedural Due Process claim against Mr. Smith, in addition to their Fifth Amendment Substantive Due Process and Fourth Amendment Unreasonable Seizure claims against both Defendants, will be dismissed with prejudice. Pursuant to the discretion provided by 28 U.S.C. § 1367(c), this Court also declines jurisdiction over Plaintiffs' state-law claims.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

For the purposes of Defendants' Motion to Dismiss, the following facts are uncontested.

Mr. Smith is an inspector who works for co-defendant Metro.  On January 15, 2008, Mr. Smith sent Plaintiffs a Notice To Correct Violation ("Notice"), which stated that Plaintiffs were in "violation of the Metropolitan Code" for failure to provide handrails for all the stairways in and around their home.  (Compl. ¶ 6 and Compl. Ex. A.)  The Notice further specified that if Plaintiffs failed to install the handrails within one month, they would be "convicted of violating the laws of the Metropolitan Government" and fined "up to Fifty ($50.00) Dollars for each offense and each day" until they complied with Metro Code § 16.24.340. (Compl. Ex. A.)  Alternatively, the Notice stated that Metro and its agents were legally "empowered" to enter Plaintiffs' property, "remove such violation," and then bill Plaintiffs for the cost.  (Id.)  The Notice did not provide a way to contest the applicability of the Metro Code, but did mention that Plaintiffs would be "responsible for the payment of all court costs incurred with the processing of the court case."  (Id.)

Plaintiffs later called Mr. Smith, who stated that they "better 'install [the] railings, pay, or both.' " (Compl. ¶ 17.)  "Out of fear of being 'convicted of violating the laws of the Metropolitan Government,' " Plaintiffs spent $1,000 to install the unwanted handrails.  (Compl. ¶ 18 (quoting Ex. A).)  Plaintiffs now contend that Defendants knew or should have known that Metro Code § 16.24.340 did not require them to install handrails because their property was "grandfathered in" and that Defendants intentionally misrepresented the law through the Notice and the phone call.  (Compl. ¶ 14, 23, 32-35.)[1]  A statement by Bill Penn, Assistant Codes Director for Metro, later confirmed that Plaintiffs' home was exempt from the Metro Code because only new homes had to conform with § 16.24.340.  (Compl. ¶ 19.)  Plaintiffs also assert that Mr. Smith singled them out for disparate treatment based on the fact that their home is "similar to hundreds of homes in the area built during the 1950's without handrails" but, to their knowledge, no other homeowner received a similar Notice.  (Compl. ¶¶ 15, 16.)

Plaintiffs filed suit in the Davidson County Chancery Court seeking redress "of their statutory rights under the Governmental Tort [Liability] Act and their rights under the Constitution of the United

---

[1] The Complaint is misnumbered, so ¶¶ 33-35 appear twice.  This citation refers to the second ¶ 33, the first ¶ 34, and the first ¶ 35.

States, specifically, but not limited to the Equal Protection and Due Process clauses . . . and an unconstitutional seizure . . . , as well as Civil Rights violations under 42 U.S.C. §§ 1983." (Compl. ¶ 1.) In response, Defendants removed the suit to federal court and filed a Motion to Dismiss.

## II.    PROCEDURAL STANDARD OF REVIEW

When ruling on a defendant's motion to dismiss, this Court "construe[s] the complaint liberally in the Plaintiffs' favor and accept[s] as true all factual allegations and permissible inferences therein." Gazette v. City of Pontiac, 41 F.3d 1061, 1064 (6th Cir. 1994). Regardless of the outlandishness or lack of independent support for a complaint's factual assertions, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 256, 286 (1986). A Complaint that merely consists of "a formulaic recitation of the elements of a cause of action" or a "naked assertion" lacking "some further factual enhancement" can be dismissed at the pleading stage. Twombly, 550 U.S. at 555, 557.

Under the new Bell Atlantic Corp. v. Twombly standard, a complaint must allege "enough facts to state a claim to relief that is plausible on its face" to withstand a Fed. R. Civ. P. 12(b)(6) motion to dismiss. 550 U.S. at 570. Twombly's more rigorous "plausibility" standard supplants the earlier standard established by Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The most significant difference between the two pleading standards is that Twombly allows for the Rule 12(b)(6) dismissal of "a wholly conclusory statement of claim . . . whenever the pleadings [leave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 550 U.S. at 561 (alterations in original) (quoting Conley, 355 U.S. at 45). As a result, the Twombly Court dismissed an anti-trust claim that was based solely on allegations of parallel conduct because there was an "obvious alternative explanation" supporting the inference that there was no anti-competitive conspiracy. Id. at 567. While the Supreme Court recognized that parallel conduct was "admissible circumstantial evidence from which the

fact finder may infer agreement," the Court did not find that this allegation suggested a conspiracy was afoot when such conduct could "just as well be independent action." Id. at 553, 557.

The Supreme Court recently reaffirmed Twombly in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), which further clarified that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The plaintiff in Iqbal asserted a claim for unconstitutional discrimination premised on allegations that the defendants " 'knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff]' to harsh conditions of confinement 'as a matter of policy, solely on account of [the plaintiff's] religion, race, and/or national origin and for no legitimate penological interest.' " Id. at 1951. The Supreme Court reversed the Second Circuit's denial of the defendants' motion to dismiss the claim, recognizing these allegations to be "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." Id. (citing Twombly, 550 U.S. at 555).

### III. DISCUSSION

#### A. Federal Claims Under 42 U.S.C. § 1983

Defendants removed this case in order for the Court to consider Plaintiffs' 42 U.S.C. § 1983 claims under Federal Question jurisdiction. In pertinent part, § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983 (2000). Local governments and their officials are included "among those persons to whom § 1983 applies." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). Therefore, both Defendants in this case are covered by § 1983's scope. But unless state policy "causes [a state] employee to violate another's constitutional rights," the state itself cannot be held liable for the actions of a rogue official. Id. at 691-92 (internal quotations omitted). The failure to allege an unconstitutional government policy, which then causes the deprivation of a protected interest by an official, would consequently preclude government liability under § 1983.

Moreover, § 1983 only allows plaintiffs to recover damages as a remedy for a violation of a Constitutional right; it does not confer independent rights. Graham v. Connor, 490 U.S. 386, 393-94

(1989). As the Sixth Circuit held in Codd v. Brown, 949 F.2d 879, 882 (6th Cir. 1991), a "failure to identify a right, privilege or immunity secured by the Constitution that was violated merits dismissal of the cause of action for failure to state a claim upon which relief can be granted."[2]

>    **(i)      Equal Protection**

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Sunday Lake Iron Co. v. Twp. of Wakefield, 247 U.S. 350, 352 (1918). There is no need for Equal Protection claimants to be part of a broad class of mistreated people, and the Supreme Court has held that "the number of individuals in a class is immaterial for equal protection analysis." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 n.* (2000).

To establish a "class of one" violation of the Equal Protection Clause, a plaintiff must "allege[] that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 564. In such cases, a plaintiff can show that a purported government action lacks rational basis by either "negativ[ing] every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." Warren v. City of Athens, 411 F.3d 698, 711 (6th Cir. 2005) (quotations omitted) (alteration in original).

Generally, legislation or other government actions are "presumed valid" if the classification drawn is "rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). Furthermore, a mere error of judgment is not enough to state an Equal Protection violation; there "must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity." Sunday Lake Iron, 247 U.S. at 353. A "class of one" suit would

---

[2] In order to state a claim upon which relief can be granted, both § 1983 and qualified immunity require the violation of a constitutional right. For qualified immunity, the Sixth Circuit Court in Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009) "employ[ed] a two-part test, asking (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." With the Supreme Court's recent ruling in Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), courts may now consider these two prongs in any order. As a result, an initial determination that a constitutional right was not violated can also support dismissal of this case on the basis of qualified immunity.

therefore successfully pass the pleading stage if the alleged facts allow for a "plausible" inference that the plaintiff's adverse treatment was "motivated by personal malice unrelated to the defendant's official duties." Klimik v. Kent County Sheriff's Dep't, 91 Fed. Appx. 396, 401 (6th Cir. 2004); see Warren v. City of Athens, 411 F.3d 698 (the city's placement of barricades around the plaintiffs' business might constitute a "class of one" violation because the plaintiffs' son defeated the city prosecutor in a prior election for a higher office); Bower v. Vill. of Mount Sterling, 44 Fed. Appx. 670 (6th Cir. 2002) (a prima facie "class of one" claim is established if a mayor appoints two prospective officers similarly situated to the plaintiff by the normal appointment procedure, but strays from the established hiring policy in order to allegedly spite the plaintiff for his parents' political views). Without facts that suggest the defendant possessed personal animus against the plaintiff or some other malicious motivation, however, a "class of one" claim will generally fail. See Klimik, 91 Fed. Appx. at 401 ("Because [the plaintiff] does not allege any facts or produce evidence suggesting that defendants harbored any personal animus toward him, he does not raise a genuine issue of material fact concerning animus in support of his Olech claim.").

Plaintiffs here do not claim that the Metro Code fails the rational basis test. Instead, Plaintiffs seem to allege an as-applied violation by claiming that Defendants were "motivated by animus or ill-will" when they intentionally singled Plaintiffs out for differential treatment, thereby depriving that government action of any rational basis. Warren, 411 F.3d at 711.

Plaintiffs allege several facts in support of this legal conclusion. First, Plaintiffs maintain that the Metro Code "grandfathered in" their house, thus exempting them from having to conform to the standards set in the Metro Code pertaining to handrails. (Compl. ¶¶ 14, 19.) Plaintiffs further aver that their house is "similar to hundreds of homes in the area" without handrails, but that only they, out of everyone in their neighborhood, received a Notice from Defendants. (Compl. ¶¶ 15. 16.) Finally, Plaintiffs allege that Mr. Smith maintained that Plaintiffs were in violation of the Metro Code and told them that they had better "install [the] railings, pay, or both." (Compl. ¶ 17.)

These factual allegations, which the Court presumes to be true for the purposes of the present motion, do not "plausibily" demonstrate, under the Twombly standard, that Plaintiffs' equal protection rights were violated. While the citation of Plaintiffs' home for a Metro Code violation constitutes differential treatment from "similarly situated" homeowners, Plaintiffs have not yet alleged facts that

support the inference that Defendants intended this outcome.  Even if Defendants intentionally sent the Notice, they did not necessarily engage in "an intentional violation of the essential principle of practical uniformity." Sunday Lake Iron, 247 U.S. at 353.  Unlike Warren and Bower, Plaintiffs in the instant case did not already have a sour relationship with Defendants.  Nothing in the pleading shows that Defendants were "motivated by personal malice unrelated to the defendant's official duties." Kimlik, 91 Fed. Appx. at 401.  As in Klimik, Plaintiffs here fail to "allege any facts or produce evidence suggesting that defendants harbored any personal animus toward [them]" and therefore cannot "raise a genuine issue of material fact concerning animus." Id.

It is of no moment that the Complaint specifically alleges that Defendants "intentionally and willfully" sent "materially false and misleading statements" regarding the Metro Code.  (Compl. ¶ 23.) Much like the plaintiff in Iqbal, who accused the defendants of "willfully and maliciously" subjecting him to confinement "for no legitimate penological interest," Plaintiffs here also need facts that support their characterizations of Defendants' conduct.  The Complaint's imputation of intent is nothing more than "a formulaic recitation of the elements of a cause of action" that is "wholly conclusory." Twombly, 550 U.S. at 555, 561.

Furthermore, Plaintiffs fail to rebut the "obvious alternative explanation," Twombly, 550 U.S. at 567; Iqbal, 129 S. Ct. at 1951, for their receipt of the Notice: that Defendants made a mistake in applying the law.  Metro's policy, as described by Bill Penn, was to refrain from enforcing Metro Code § 16.24.340 on existing homes.  Plaintiffs also state that they were the only homeowners who received a Notice. Considering these facts alone, the "plausible" inference is that Defendants made a mere error of judgment in sending the Notice rather than a conscious and malicious effort to force Plaintiffs to spend money on handrails.  In the absence of a prior history of animus or any hint of malicious motivation, it is not "plausible" to believe that Defendants would act in contravention of their policy against enforcing § 16.24.340 on existing homes. Twombly, 550 U.S. at 570.  An anomalous application of the law does not, without anything more, raise the suspicion that there was intentional wrongdoing.  When confronted with nothing more than bare assertions of unlawful activity, a court's first instinct is not to conclude that a violation occurred when it could "just as well be" explained as innocent conduct. Twombly, 550 U.S. at 557.  Since no amount of precaution can prevent every mistaken enforcement of the Metro Codes,

Plaintiffs fail to show that the incident "plausibly" resulted from anything other than an error.

Nor does Mr. Smith's statement that Plaintiffs had to "install [the] railings, pay, or both" during a phone call necessarily mean that he intended to misapply the law out of spite. Mr. Smith was just an inspector and may or may not have had any part in determining that Plaintiffs were in violation of the Metro Code. Even if he did send the Notice, he could have forgotten the details about Plaintiffs' individual case and did not immediately catch his mistake. As <u>Sunday Lake Iron</u> held, a misstatement of the law alone is not grounds for finding that an official violated the Equal Protection Clause. 247 U.S. at 353.

Without the "intentional violation of the essential principle of practical uniformity," <u>id.</u>, Plaintiffs insufficiently plead a "class of one" violation of the Equal Protection Clause. In its current form, the Complaint contains "a formulaic recitation of the elements of a cause of action" that is "wholly conclusory." <u>Twombly</u>, 550 U.S. at 555, 561. None of the asserted facts give rise to a "plausible" inference of "animus or ill-will." <u>Warren</u>, 411 F.3d at 711. Plaintiffs also fail to counter the "obvious alternative explanation" that this incident was the result of an innocent mistake. <u>Twombly</u>, 550 U.S. at 567. As a result, § 1983 does not afford Plaintiffs relief. <u>See</u> <u>Codd</u>, 949 F.2d 879, 882 (6th Cir. 1991).

While a revised Complaint could potentially make out a valid claim for an Equal Protection violation against Mr. Smith in his individual capacity by alleging facts that plausibly show that there was no mistaken application of the law, Plaintiffs would still be unable to prove that Metro's policy "cause[d] [Mr. Smith] to violate another's constitutional rights." <u>Monell</u>, 436 U.S. at 691-92. Plaintiffs already concede in their Complaint that Metro's policy "grandfathered in" and exempted Plaintiffs' home. Consequently, the Equal Protection claim against Metro will be dismissed with prejudice, and the claim against Mr. Smith will be dismissed without prejudice.

### (ii) Procedural Due Process

The general purpose of the Due Process Clause is to provide individuals with "notice and an opportunity to be heard before the Government deprives them of property." <u>United States v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 48 (1993). In order to establish that a Procedural Due Process violation occurred, Plaintiffs must show that: (1) they have a protected life, liberty, or property interest protected by the Fourteenth Amendment, (2) they were deprived of that interest within the meaning of the Due Process Clause, and (3) the state did not afford them adequate procedural rights prior to depriving

them of their protected interest.  Gunasekera v. Irwin, 551 F.3d 461, 467 (6th Cir. 2009); Hahn v. Star Bank, 190 F.3d 708, 716 (1999).

### (a)  Plaintiffs have a protected property interest in their money.

The Constitution recognizes a broad spectrum of "property" interests.  In Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972), the Supreme Court noted that "[p]roperty interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules . . . ."  Accordingly, "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, and money."  Id. at 571-72; see also Campbell v. Shearer, 732 F.2d 531 (6th Cir. 1984) (assuming that the seizure of $280,100 required adequate process).

In this case, Plaintiffs allege that Defendants deprived Plaintiffs of $1,000 without due process.  While $1,000 may be a relatively small amount, the government must still accord owners a minimal level of process when it seeks to deprive owners of any protected property interest.

### (b)  Defendants directly deprived Plaintiffs of their money.

Not all deprivations of protected interests constitute a violation of the Due Process Clause.  A deprivation that is an "indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property."  O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 787 (1980) (holding that the government did not have to provide a hearing to residents of a nursing home before revoking that nursing home's license); see also Martinez v. California, 444 U.S. 277 (1980) (holding that the release of a convict who later murdered the plaintiffs' daughter did not constitute a deprivation of life without due process).  If the grievance alleged amounts to a "consequential injur[y] resulting from the exercise of lawful power" rather than a "direct appropriation," then the Due Process Clause is not implicated.  O'Bannon, 447 U.S. at 789 (quoting Legal Tender Cases, 79 U.S. 457, 551 (1870)).

Defendants' actions in the instant case were sufficiently direct to constitute a government deprivation.  Unlike in O'Bannon and Martinez, Defendants in the instant case acted upon Plaintiffs in order to get them to comply with a Metro ordinance.  This Notice was not a decision that affected a third party, thereby setting off a random chain of events which eventually injured the claimant.  Rather, the

Notice addressed Plaintiffs personally and pointed out specific flaws on their property that they had to fix. Additionally, the Notice is worded as if it was passing a final judgment on Plaintiffs. Such a declaration, if valid, would have changed Plaintiffs' legal entitlements at that time. Defendants therefore contemplated that Plaintiffs and other recipients of a similar Notice would have to expend some time or money to abate a purported violation. The fact that Plaintiffs' house was actually exempt from the Metro Code does not change the targeted character of the Notice.

Although Plaintiffs voluntarily installed the handrails, this expenditure was practically mandatory because noncompliance meant the imposition of substantial legal penalties. Defendants contend that Plaintiffs should have waited for the government to prosecute them and that compliance in anticipation of prosecution is not yet a deprivation. Still, not many people would welcome the prospect of government prosecution; and, the very threat of legal action is extremely coercive. Moreover, Defendants acknowledge the existence of extensive pre-deprivation procedures that allow property owners to appeal a Notice. This suggests that Metro already considered that the loss suffered by a property owner when conforming with the Metro Code amounted to a direct deprivation requiring due process.

### (c) Plaintiffs Fail to Allege Sufficient Facts to Give Rise to a Plausible Inference of a Due-Process Violation.

The quality of process required by the Due Process Clause depends on the manner in which the alleged deprivation arises. As stated in Mathews v. Eldridge, 424 U.S. 319 (1976), "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 333 (quotations omitted). Generally, an individual must be "given an opportunity for a hearing *before* he is deprived of any significant property interest." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (emphasis in original) (quotations and citations omitted). If pre-deprivation procedures are "impracticable," then federal courts turn to an analysis of post-deprivation procedures. Hudson v. Palmer, 468 U.S. 517, 533 (1984); see also Zinermon v. Burch, 494 U.S. 113, 128 (1990) ("In some circumstances . . . a statutory provision for a post-deprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process."). An examination of post-deprivation process is most appropriate when "dealing with a tortious loss of . . . property as a result of a random and unauthorized act by a state employee . . . not as a result of some established state procedure." Logan v.

Zimmerman Brush Co., 455 U.S. 422, 435-36 (1982); see also Parratt v. Taylor, 451 U.S. 527, 541 (1981) ("In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur.  It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place."), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31 (1986) (holding that a loss occasioned by an official's negligence does not "deprive" an individual of life, liberty, or property within the meaning of the Fourteenth Amendment).

When determining the adequacy of pre-deprivation procedures, the Supreme Court has emphasized three factors:  "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Mathews 424 U.S. at 335.  Furthermore, due process requires that notice of the pre-deprivation process be "reasonably calculated, under all the circumstances, to apprise intended parties of the pendency of the action and afford them an opportunity to present their objections."  Jones v. Flowers, 547 U.S. 220, 226 (2006) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)); see also Fox v. Van Oosterum, 176 F.3d 342, 349 (6th Cir. 1999) ("Generally, predeprivation process consists of notice and a hearing.").  If it is clear that the method of notice was not "reasonably certain to inform those affected," then the due process notice requirement is not satisfied.  Mullane, 339 U.S. at 314.

For post-deprivation process, this Court applies a truncated version of the Mathews standard.  Since tort remedies are "the only remedies the State could be expected to apply" when a deprivation of a protected interest has already occurred, the second Mathews factor, the value of additional pre-deprivation safeguards, is "negligible."  Zinermon, 494 U.S. at 128-29.  Only the other two Mathews factors apply in an analysis of a state's post-deprivation process.  In addition, the Court considers whether relevant state remedies are capable of providing adequate compensation for the deprivation.  See Hudson, 468 U.S. at 534; Parratt, 451 U.S. at 543-44 (1981) (holding that where state law remedies "could have fully compensated the respondent for the property loss he suffered," the post-deprivation

process passes muster under the Due Process Clause).[3]

Notice of post-deprivation process is also required, though the standard is not as rigorous as the notice requirement for pre-deprivation process. In <u>City of West Covina v. Perkins</u>, 525 U.S. 234 (1999), the Supreme Court held that the provision of "generally available state statutes and case law" constitutes sufficient notice of post-deprivation remedies. <u>Id.</u> at 240-41. "Once the property owner is informed that his property has been seized, he can turn to these public sources to learn the remedial procedures available to him. The city need not take other steps to inform him of his options." <u>Id.</u>; <u>cf.</u> <u>Memphis Light, Gas and Water Div. v. Craft</u>, 436 U.S. 1 (1978) (holding that a municipal utility company could not terminate service without providing adequate notice of the administrative procedure for resolving an accounting dispute when this information was not made publically available).

Ultimately, the resolution of Plaintiffs' due process claim depends on what Defendants did to deprive Plaintiffs of due process. While Defendants argue that Plaintiffs simply failed to avail themselves of the existing pre-deprivation hearing processes, the actual injury (expenditure of $1,000 for unwanted handrails) comes from the lack of pre-deprivation *notice* regarding the options available to Plaintiffs to contest the applicability of the Metro Code rather than the insufficiency of the hearings. The Complaint, however, fails to speak to the manner in which Plaintiffs' loss was occasioned. Since the Court cannot ascertain the nature of Plaintiffs' Due Process claim, it cannot apply an appropriate remedy.

If the Notice was drafted either by Metro or by Mr. Smith in his good-faith official capacity, then Metro's pre-deprivation procedural due process is inadequate because the Notice failed to provide Plaintiffs with notice of their pre-deprivation options.[4] Such an omission may amount to an unconstitutional government policy that could subject Metro, but not Mr. Smith in his individual capacity,

---

[3] The fact that a § 1983 action allows additional recovery of attorney fees that are not recoverable under state law does not mean that the state law remedies are insufficient as a matter of due process. See <u>Parratt v. Taylor</u>, 451 U.S. 527, 544 (1981) (the possibility that a plaintiff may recover less in a state-law post-deprivation action than he would in a § 1983 action is not "determinative of the adequacy of the state remedies").

[4] A suit against a person in his or her good faith official capacity is the same as a suit against the government employer. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). The suit against Mr. Smith in his official capacity therefore dissolves into the suit against Metro.

to liability under § 1983.[5]  Monell, 436 U.S. at 691-92.

Typically, the pre-deprivation notice requirement is satisfied with a short statement informing recipients of their options if they wish to challenge the detrimental application of a law.  Yet, in this case, the Notice asserted that Plaintiffs were already in violation of the Metro Code and did not even hint that there was another option besides compliance.  Because of its failure to mention the possibility of challenging the citation, the Notice cannot be "reasonably certain to inform those affected" of their right to a hearing.  Mullane, 399 U.S. at 314.  Although the Notice does hint at the possibility of a day in court, the Notice completely forecloses Plaintiffs' chances of prevailing and emphasizes the costs associated with court involvement.  The Notice even stated that the Department of Codes Administration could enter Plaintiffs' property to "remove such violation" at their expense without resorting to prosecution.  (Compl. Ex. A.)

Even through the lens of the Mathews factors, the lack of notice still proves fatal to Defendants' claims that the pre-deprivation process was adequate.  First, the official action could impose extremely large burdens on homeowners because they would be forced to retrofit their homes.  In this case, it cost $1,000.  In a larger home, it could cost much more.  Second, the procedures used created an unacceptably high probability that an erroneous deprivation would occur.  Notice is a necessary part of the pre-deprivation process.  Fox, 176 F.3d at 349.  Without notice, homeowners are more likely to believe that a letter like the Notice here is a final judgment that precludes the possibility of appeal.  Additionally, it enables misinformed or malicious Metro Code inspectors to reinforce the erroneous notion that compliance is mandatory.  If Metro Code inspectors were required to send form letters that included

---

[5] Plaintiffs cannot hold Mr. Smith liable in his individual capacity for a procedural due process violation under § 1983.  There is a recognized legal "difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers."  Parratt v. Taylor, 451 U.S. 527, 542 (1981) (citation omitted); Vicory v. Walton, 721 F.2d 1062, 1064 (6th Cir. 1983).  In the latter situation, "even though there is action 'under color of' state law sufficient to bring the amendment into play, the state action is not necessarily complete" because "the existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment."  Parratt, 451 U.S. at 542 (citation omitted).  Allowing a § 1983 claim for an injury inflicted by a rogue official "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States."  Parratt, 451 U.S. at 544 (citation omitted).  Instead, Plaintiffs must use relevant state tort remedies in their suit against Mr. Smith in his individual capacity.

adequate notice of pre-deprivation procedures, homeowners would not be exposed to the risk of making unnecessary expenditures to remedy a non-violation. Last, requiring the addition of a line on the Notice saying something to the effect of "If you wish to contest this Notice, please call xxx-xxx-xxxx" would not be burdensome. Metro's appeals process must include a proper means of informing affected homeowners of their right to appeal an administrative decision that could impose substantial new costs.

But supposing that Metro had existing form letters that provided notice of the process for appealing a purported violation and Mr. Smith drafted his own letter instead, omitting the required notice in bad faith, then Mr. Smith's act would result in "a tortious loss of . . . property as a result of a random and unauthorized act by a state employee . . . not as a result of some established state procedure." Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-36 (1982). Since Metro cannot reasonably anticipate this type of intentional abuse of power, additional pre-deprivation procedures would be "impracticable." Hudson, 468 U.S. at 533. If this is the case, then the Procedural Due Process inquiry would turn to the adequacy of Tennessee's post-deprivation remedies. Mr. Smith might then be individually liable in tort; and, because Metro's policy would not have "cause[d] [the] employee to violate another's constitutional rights," Metro could not be held liable for Mr. Smith's independent effort to deprive Plaintiffs of their right to procedural due process. Monell, 436 U.S. at 691-92.

Tennessee's post-deprivation tort remedies, however, pass muster under a truncated version of the Mathews standard and therefore satisfy due process. First, Plaintiffs' interest is still the lost $1,000 paid for the unnecessary handrails. Second, adding more post-deprivation procedures would be superfluous and present unnecessary administrative burdens. As the Sixth Circuit held in Brooks v. Dutton, 751 F.2d 197, 199 (6th Cir. 1985), "the State of Tennessee has provided adequate procedures to assure the return of items either negligently or intentionally converted." In the absence of any pleading regarding the insufficiency of the post-deprivation procedures available to Plaintiffs, this Court follows the holding in Brooks. Consequently, the only viable procedural due process claim that Plaintiffs can pursue must be based on a lack of pre-deprivation process.

Unfortunately for Plaintiffs, the facts as pleaded in the Complaint do not establish the requisite "plausible" inference that Defendants violated their right to pre-deprivation process. Twombly, 550 U.S. at 570. While Plaintiffs do allege a loss caused by the lack of pre-deprivation notice, they have not alleged

any facts supporting the notion that either Metro or Mr. Smith in his good faith official capacity drafted the deficient Notice letter.  Without such crucial allegations, the Court cannot plausibly infer that Defendants wrote and sent the noxious Notice pursuant to an administrative policy as required by <u>Monell</u>.  It could "just as well be" possible that Mr. Smith, acting as an individual, intentionally targeted Plaintiffs.  <u>Twombly</u>, 550 U.S. at 557.[6]  Accordingly, additional facts must be pled.  This Court will therefore grant Defendants' Motion to Dismiss Plaintiffs' Procedural Due Process claim without prejudice.

        **(iii)**      **Substantive Due Process**

A government or government actor violates substantive due process when it either infringes on an individual's right that is "so rooted in the traditions and conscience of our people as to be ranked as fundamental," <u>Michael H. v. Gerald D.</u>, 491 U.S. 110, 122 (1989) (quoting <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 105 (1934)), or acts in a way that "shocks the conscience."  <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952) (holding that substantive due process forbids the police from forcing a tube into a defendant's mouth to induce vomiting).  Substantive due process is typically invoked to protect the right to marry, have a family, procreate, and maintain one's bodily integrity.  <u>Albright v. Oliver</u>, 510 U.S. 266, 272 (1994).  Furthermore, the Supreme Court has embraced a general policy against "expand[ing] the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992).

In the instant case, there is no evident breach of a fundamental right.  A loss of $1,000 is not anywhere near the universe of fundamental rights traditionally protected by substantive due process.  Plaintiffs might argue that Defendants violated their right to be free from false accusations by the government, but this would still be outside the scope of the fundamental rights already defined by the Supreme Court.  Nor does this financial loss "shoc[k] the conscience."  <u>Rochin</u>, at 342 U.S. at 172.  It would be absurd to liken the government-sponsored theft of $1,000 to a denigration of a victim's

_____

[6] The Complaint, in fact, repeatedly asserts that Mr. Smith intentionally targeted Plaintiffs.  If the Court were to believe this contention, then Plaintiffs would not state a Procedural Due Process claim because Tennessee's post-deprivation tort remedies are adequate.  <u>Brooks v. Dutton</u>, 751 F.2d 197, 199 (6th Cir. 1985).  Since this imputation of intent is "wholly conclusory," <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 561 (2007), however, the Court leaves open the possibility that the Notice was drafted in accordance with Metro's official policies.  For further discussion regarding Mr. Smith's malicious intent, see discussion in Part I.A., <u>supra</u>.

fundamental right to human dignity. The Court will therefore dismiss Plaintiffs' Substantive Due Process claim with prejudice.

### (iv) Unreasonable Seizure

Although typically raised in the context of criminal investigations, the Fourth Amendment's protection against unreasonable government seizures also applies in the civil context. Soldal v. Cook County, 506 U.S. 56, 67 (1992). In United States v. Jacobsen, 466 U.S. 109, 113 (1984), the Supreme Court held that a Fourth Amendment seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." Because this concept of seizure stems from the Supreme Court's Fourth Amendment doctrine governing the seizure of a person, it is possible to draw analogies to determine whether a seizure of property has actually occurred within the meaning of the Fourth Amendment. See id. at 114 n.5 ("While the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment—meaningful interference, however brief, with an individual's freedom of movement."). Since a person is seized only when the government employs "physical force or a show of authority" such that "a reasonable person would have believed that he was not free to leave," Mendenhall, 446 U.S. 544, 553-54 (1980), property is likewise seized when a person's possession of property is interrupted in the same way. So while "threats alone cannot support a constitutional claim," Thacker v. City of Columbus, 328 F.3d 244, 258 (6th Cir. 2003), threats that "result in a constitutional deprivation" could constitute a seizure. Lamar v. Steele, 698 F.2d 1286, 1286 (5th Cir.), cert denied, 464 U.S. 821 (1983).

Furthermore, because a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," Brower v. County of Inyo, 489 U.S. 593, 596 (1989), a seizure must also involve government control over a person and, by extension, property. As the Sixth Circuit has observed, "Soldal and the other Supreme Court cases addressing seizures of property all concern state actors' role in taking possession of property." Fox v. Van Oosterum, 167 F.3d 342, 350 (6th Cir. 1999). While there may be a seizure even if the government *itself* does not take control over property, the government must be intimately involved in a physical seizure for there to be a Fourth Amendment violation. See Soldal, 506 U.S. at 58-59 (holding that a seizure occurred when a landlord illegally removed the plaintiffs' mobile

home while several sheriff's deputies prevented the plaintiffs from stopping the eviction).

Given the case law and the active connotation of the word "seizure," it would be inapt to characterize Plaintiffs's expenditure of $1,000 as a Fourth Amendment seizure.  Neither Metro nor Mr. Smith utilized "physical force" at any time.  Plaintiffs, however, also aver that they spent the money "[o]ut of fear of being 'convicted' " and argue that they were "coerced" by the terms of the Notice and Mr. Smith's phone call.  (Compl. ¶¶ 18, 46.)  Yet, even if Defendants' actions constitute a "show of authority" under Mendenhall, Plaintiffs still fail to show that Defendants ever acquired physical possession or control of the $1,000 as required by Brower and Fox.  Additionally, because Plaintiffs fail to allege that there was even a minimal level of coordination between the government and a third-party recipient of the seized property, there is no risk that the government is supporting an illegal third-party seizure like in Soldal.

While the Notice's wording may have served to deprive Plaintiffs of their money without due process, it is not an invoice that would have the money pass through government hands.  Plaintiffs' only interaction with Defendants was through their receipt of the Notice and their phone call to Mr. Smith; but, Defendants never claimed possession or control over the $1,000 at those times.  At most, the Notice threatened the future seizure of money only *after* Defendants installed the handrails on Plaintiffs' property or prosecuted Plaintiffs for noncompliance.  Moreover, the Notice gave Plaintiffs one month before Defendants would take action.  Nothing changed when Plaintiffs called Mr. Smith; there was no revelation that the deadline had changed and Mr. Smith did not declare that different or additional conditions were being imposed.  Without actual enforcement of the Notice, there can be no "meaningful interference" with Plaintiffs' property interests.  Jacobsen, 466 U.S. at 113.  Regardless of how Plaintiffs felt, they cannot claim that a "reasonable person" would believe that Defendants wanted possession or control of their money *before* the deadline.  Mendenhall, 446 U.S. at 554.  These mere threats of a future seizure "cannot support a constitutional claim."  Thacker, 328 F.3d at 258.  Since the alleged facts rule out the possibility that a violation of the Fourth Amendment occurred, the Court will dismiss this claim with prejudice.

**B.      State-law Claims**

In addition to the § 1983 Federal Question claims, Plaintiffs attempt to assert state-law claims as an alternate avenue for recovery.  Specifically, Plaintiffs purport to state claims for relief under the TGTLA and the common-law tort of intentional misrepresentation.  Under 28 U.S.C. § 1367(c)(3), this Court may

decline jurisdiction over remaining state-law claims after dismissing all claims over which it had original jurisdiction. At all times, the Court is guided by its consideration of "the values of judicial economy, convenience, fairness, and comity." Carnegie-Mellon University v. Cohill, 484 U.S. 343, 351 (1988).

Since the Court will dismiss all of Plaintiffs' § 1983 claims, Plaintiffs' residual state-law claims are now untethered from any federal jurisdictional mooring. Having considered "the values of judicial economy, convenience, fairness, and comity," id., the Court will decline to exercise jurisdiction over the state-law claims, and will dismiss those claims without prejudice to Plaintiffs' ability to refile them in state court should they so desire.[7]

## IV.    CONCLUSION

Defendants' Motion to Dismiss will be granted because the Complaint fails to establish a "plausible" inference that Plaintiffs' Constitutional rights were violated. Since Plaintiffs' Equal Protection and Procedural Due Process claims can be made viable with an opportunity to redraft their Complaint, the Court will dismiss these claims without prejudice. The Substantive Due Process and Unreasonable Seizure claims, however, are unsalvageable and subject to dismissal with prejudice. Without any remaining independent basis for federal jurisdiction, this Court will also dismiss Plaintiffs' state-law claims without prejudice.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

---

[7] Although the Court declines to address the merits of Plaintiffs' state-law claims, the Court notes that TGTLA does not provide a cause of action against a government entity based upon a government employee's intentional or negligent misrepresentation of the law. Tenn. Code § 29-20-205(6). Even if Plaintiffs had stated a claim against Metro under the TGTLA, the Court would be constrained to decline to exercise jurisdiction over such a claim. See Tenn. Code Ann. § 29-20-307 (jurisdictional provision); Beddingfield v. City of Pulaski, 666 F. Supp. 1064, 1067 (M.D. Tenn. 1987) (holding that federal courts are "obligated to apply the [TGTLA's jurisdictional] limitation as a matter of state substantive law" in the absence of diversity jurisdiction), rev'd on other grounds, 861 F.2d 968 (6th Cir. 1988). In addition, Plaintiffs' complaint likely fails to allege sufficient facts to create a "plausible" inference that Mr. Smith knowingly misrepresented the law through the Notice and the phone call, under Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). For further discussion regarding Mr. Smith's malicious intent, see discussion in Part I.A., supra.